2009 Ark. App. 240

**Jackie Donald HOFFARTH, Appellant,**

v.

**Anna HARP, Appellee.**

No. CA 08–681.

Court of Appeals of Arkansas.

April 1, 2009.

Rehearing Denied May 6, 2009.

Woodard Law Firm, PLC, by: Ernie Woodard, Springdale, for appellant.

Dossey & Burke, PLC, by: Brian T. Burke, Bentonville, for appellee.

WAYMOND M. BROWN, Judge.

This case involves the guardianship of Jackie Dane ("Jake") Hoffarth. The parties originally agreed that Jake's father, appellant Jackie Donald Hoffarth, would be the guardian of Jake's person and estate. Jake's mother, appellee Anna Harp, sought to replace Jackie as Jake's guardian. After hearing testimony from the parties and their relatives, the court granted Anna's petition to substitute her as guardian. Jackie appeals from the circuit court's order. He contends that the circuit court used the wrong standard in determining whether he should be removed as guardian. He also challenges the ultimate decision to substitute Anna as Jake's guardian. We affirm.

Jake was diagnosed with Williams syndrome at age seven. According to testimony from the parties, Williams syndrome is a rare chromosome disorder that results in the absence of elastin, which is part of many internal organs, including the heart, kidneys, and bladder. The lack of elastin contributes to aortic and pulmonary stenosis, renal insufficiency, bladder incontinence, and knee problems. Children with Williams syndrome have widely spaced teeth, a big smile, and big lips. They also have very sensitive hearing, an automatic gag reflex, and a very selective diet. Jake has heart problems, and his renal panel is not the same as a normal adult. In addition, he has a fused right elbow and has had problems with his right knee. He functions at different ages depending on the scenario. For example, he is a normal adult when working with motors and lawn-maintenance tools, but he functions as a ten-year-old when dealing with family relationships. Jake enjoys working with weed eaters and motors. He also plays the guitar and the drums, and he participated in his school's jazz band. In the words of Jackie, "Jake can do almost anything he sets his mind to."

Jake was approximately fourteen months old when Jackie and Anna were divorced, and Anna had custody of Jake. Jake attended elementary school in the Springdale School District and was in a totally inclusive educational setting. He finished elementary school in the spring of

2000. Springdale did not have an inclusive setting in middle school, but it was important to Anna for Jake to be in such a setting, as she feared that Jake would mimic the behavior of his peers if placed in a class with only mentally disabled students. At that time, Jackie lived in Gravette. In Gravette, Jake could continue his education in an inclusive setting. Further, Jackie's life in Gravette was stable at that time. Accordingly, Jake went to live with Jackie, and Anna regularly exercised visitation. In 2005, Jackie and Anna filed a petition for co-guardianship, but because the court would not allow a co-guardianship, the two decided that Jackie would be Jake's guardian. An appropriate order was filed on March 29, 2005. Jake received his high school diploma in 2007. The guardianship and the relationship of the parties went well until Anna began taking issue with Jackie's care of Jake. To that end, she filed a petition to substitute herself as Jake's guardian on April 30, 2007. The court held the final hearing on the matter February 1, 2008. Jake was twenty-one years old at the time.

Jackie was on the witness stand for a substantial portion of the hearing, and most of the questions were directed toward his care of Jake. While examined by his own counsel, he acknowledged several medical records showing that Jake was in good health. Jackie stated that he had lived in Gravette since 1995 and that he was involved in rodeos and rodeo activities. He was a member of Cowboy Church, which has church services at rodeos. Jake has attended rodeos with him since 2005, and he would stay overnight with Jackie in the trailers at the rodeos. When Jackie is working at the rodeo, Jake is usually in the bleachers with friends.

With respect to his care, Jackie testified that Jake bathes himself and that he does not monitor Jake's showers or baths. In her testimony, Anna stated that Jake's hair was usually not cleaned or combed and that he always had dirty fingernails. Though Jackie allowed Jake to bathe himself, Anna stated that she always assisted Jake because he had a hard time reaching and did not get himself clean. Anna was also dissatisfied about the clothes Jake would bring when she had him. Anna testified that Jake would only bring one change of clothes despite planning to be with her for four days. She also did not like that Jake wore starched jeans, as they would be uncomfortable due to Jake's diarrhea episodes.

Jackie stated that Jake required significant medical attention due to the Williams syndrome. To that end, Jackie pursued special medical training and has been a certified EMT since 2005. He noted that Jake had to see a nephrologist and a cardiologist on a regular basis. Jake was generally expected to present to a nephrologist every six to eight months. He last saw one at Arkansas Children's Hospital on August 16, 2006. At that time, it was recommended that he be transferred to an adult nephrologist. He did not see another nephrologist until November 27, 2007.

Jackie also testified about an emergency appendectomy in May 2005. On the day Jake presented to the emergency room, he had gone to school, but his appendix had already ruptured. He underwent the procedure about four or five hours after arriving at the emergency room. Jackie's wife at the time, Debbie, took him to the emergency room that night; Jackie was at work at the time, and she took him to the hospital after calling Jackie to report that he was still in pain. Jackie did not call Anna until 4:00 a.m.

In another incident in July 2006, Jake's knee popped out of place while he was at Jackie's current wife's house in Vian, Oklahoma. Jackie went to Jake, stretched

out his knee, replaced his kneecap, placed him on a bed, and put ice on the knee. The next day, Jackie took Jake to the hospital in Washington County, where Jake was instructed to rest and use ice on the knee. Jake went home with Anna after being discharged, while Jackie went to the rodeo. Jake was prescribed physical therapy. He was supposed to go to two sessions for two weeks, but the therapy took five weeks because Jackie rescheduled several appointments. When asked why so many appointments were cancelled, Jackie stated that the only reason he could think of was because Jake did not wake up in time for the early morning appointments. In the end, however, one hundred percent of the goals were met.

Due to his Williams syndrome, Jake has difficulty with diarrhea. According to Jackie, he has three episodes a day. Anna testified that he had ten episodes. In any event, Jackie stated that, before being placed on his current medication, Jake had many more. A doctor prescribed medication on April 7, 2006. Jackie stated that the medication has worked as well as anything else and that Jake has not returned to the doctor since. He also recounted a call from Anna in March 2007, where she told him that Jake was experiencing rectal bleeding. Anna wanted Jackie to take Jake to the doctor, but he did not do so because he did not discover any rectal bleeding. When asked by the court, Jackie stated that he examines Jake regularly for rectal bleeding.

Jackie last took Jake to the dentist in 2007, and Jake's last teeth-cleaning was in 2004. Jackie testified that he personally monitored and inspected Jake's gums or teeth every time he (Jake) brushes. He also purchased Jake a toothbrush that played music when Jake brushes properly. He did not like taking him to the dentist because Jake must take antibiotics before going to the dentist, and Jackie did not want Jake to build an immunity. Jake has never had a cavity. Anna was more concerned. She stated that Williams syndrome affects the enamel on Jake's teeth and that the blood pressure medication and hypertension causes gum swelling.

Jake's relationship with his family was also a major issue. Jackie acknowledged that Jake calls his current wife, Becky, "Mom" and that he (Jackie) does not do anything to discourage it. Jackie agreed that it was important for Jake to have a relationship with Anna, and he stated that he allows Jake to call or see Anna whenever he wishes. During the trial, Jackie was presented a medical record showing David Hoffarth, his brother, as an emergency contact. Jackie testified that he did not list Anna as an emergency contact because David always knew where he was.

The parties also testified about events that occurred when Jake went to the prom. Jackie's wife was a photographer, and she took Jake's prom pictures. He did not provide any of the pictures to Anna. Jake went to the prom with his stepsister, though there was conflicting testimony regarding whether he was supposed to go with Anna's granddaughter. Jackie testified that the matter had been discussed but not finalized; Anna stated that Jake was supposed to actually take her granddaughter. When Jake graduated from high school, Anna and Jackie discussed invitations and "thank you" notes. Anna remarked that she was only given twenty-five generic invitations, despite ordering one hundred invitations. She also did not receive any senior pictures. Jackie also stated his intention to move to Vian and take Jake with him if allowed to do so by the court.

At the conclusion of the hearing, the court stated that it would grant Anna's petition to substitute her as Jake's guard-

ian. The court relied on the supreme court's definition of "unsuitable," as explained in *In re Guardianship of Vesa,* 319 Ark. 574, 892 S.W.2d 491 (1995). From the bench, the court likened the litigation to bickering parents in a traditional custody dispute. It chided the mother for complaining about Jake's activities at the rodeo, as there was no evidence that those activities were resulting in any harm. It also admonished her for telling Jake that he would be coming to live with her prior to the filing of the petition. But the court was also displeased with Jackie for failing to make sure that Anna was involved in the planning of Jake's prom or other activities, for listing someone other than Anna as Jake's emergency contact, and for not correcting him when he called someone else "Mom." The court also found that Jackie was derelict in his responsibility to ensure that Jake had medical treatment, despite the evidence that he had not been harmed as a result. These findings were incorporated in the final order entered March 28, 2008.

We review traditional cases of equity, such as probate proceedings, de novo. *Moore v. Sipes,* 85 Ark.App. 15, 146 S.W.3d 903 (2004). However, we do not reverse a circuit court's findings of fact unless they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Conner v. Donahoo,* 85 Ark.App. 43, 145 S.W.3d 395 (2004). When reviewing the proceedings, we give due regard to the circuit court's opportunity and superior position to observe and determine the credibility of witnesses. *Blunt v. Cartwright,* 342 Ark. 662, 30 S.W.3d 737 (2000).

Before reviewing the circuit court's ultimate conclusion, we must determine whether the circuit court erred when it relied on *Vesa* to determine the standard for removing Jackie as Jake's guardian. A guardian of a ward's person has the duty to care for and maintain the ward. Ark. Code Ann. § 28–65–301 (Repl.2004). A guardian may be removed on the same grounds and in the same manner for the removal of a personal representative of an estate. *See* Ark.Code Ann. § 28–65–219(b) (Repl.2004). A personal representative, and therefore a guardian, may be removed from an estate if, among other reasons, he has become "mentally incompetent, disqualified, unsuitable, or incapable of discharging his or her trust, has mismanaged the estate, [or] has failed to perform any duty imposed by law or by any lawful order of the court." Ark.Code Ann. § 28–48–105 (Repl.2004). Our probate code does not define the term "unsuitable," but our supreme court has relied on a definition provided by the Massachusetts Supreme Court:

The statutory word "unsuitable" gives wide discretion to a probate judge. Past maladministration of a comparable trust, bad character, misconduct, neglect of duty, or physical or mental incapacity, warrants a finding that an executor or administrator is unsuitable. Such a finding may also be based upon the existence of an interest in conflict with his duty, or a mental attitude toward his duty or toward some person interested in the estate that creates reasonable doubt whether the executor or administrator will act honorably, intelligently, efficiently, promptly, fairly, and dispassionately in his trust. It may also be based upon any other ground for believing that his continuance in office will be likely to render the execution of the will or the administration of the estate difficult, inefficient or unduly protracted. Actual dereliction in duty need not be shown.

*Davis v. Adams,* 231 Ark. 197, 205 n. 5, 328 S.W.2d 851, 856 n. 5 (1959) (quoting *Quincy Trust Co. v. Taylor,* 317 Mass. 195, 196–97, 57 N.E.2d 573, 574 (1944)). This definition was quoted favorably in *Vesa,* where this court affirmed an order removing someone as guardian of an incapacitated adult's estate.

Jackie contends that the circuit court erred in relying on *Vesa* when it removed him as guardian of Jake's person. He contends that the definition of unsuitable as stated in *Vesa* has only been applied to those who have been guardians of a ward's estate and that the definition is inapplicable to the guardian of a ward's person. We disagree. While the *Vesa* definition appears to have only been applied to guardianships of the estate, there is no evidence that the same definition was not meant to be applied to guardianships of the person. Other than those sections that define the duties of a guardian, *e.g.,* Ark. Code Ann. § 28-65-301 (Repl.2004) (defining the duties of guardians generally), the probate code does not make a distinction between guardians of the person and guardians of the estate. Further, other than the provision outlined in § 28-65-219(a) (allowing for the substitution of a guardian for a minor ward who has attained fourteen years of age), the probate code simply refers to the standards for removing a personal representative of an estate as those to be utilized for the substitution of a guardianship. It stands to reason that those standards would speak in terms of a decedent's or guardian's estate, but would similarly be applicable to the guardianship of the person. Thus, the circuit court did not err in relying on *Vesa* for a definition of "unsuitable" and applying that definition in its decision to substitute Anna as Jake's guardian.

All that remains is for us to review the circuit court's decision to substitute Anna as Jake's guardian. Jackie goes through all of the medical findings and notes the fact that Jake has not been harmed. He also argues that the court relied on three random instances (listing David, rather than Anna, as Jake's emergency contact; Jake not sending Anna Mother's Day or birthday cards; and Jackie allowing Jake to call Jackie's wife "Mom") to justify finding that Anna should be Jake's guardian. Anna also goes through the evidence and argues that the record supports the circuit court's finding, given the lack of effective medical treatment and Jake's shortcomings when it comes to his relationship with her.

The circuit court did not clearly err when it substituted Anna as Jake's guardian. Though Jake is chronologically an adult, he has the mental capacity of a child in certain aspects. Accordingly, he must have a guardian who is vigilant in ensuring that his needs are met. Couched in the language of *Davis* and *Vesa,* the lower court was authorized to remove Jackie as Jake's guardian if it "believ[ed] that [Jackie's] continuance in office will be likely to render the execution of the [guardianship] difficult, inefficient or unduly protracted." While there is evidence in the record from which the circuit court could have found that Jackie was still fit to continue as Jake's guardian, the decision to substitute Anna as Jake's guardian is not clearly erroneous. There were several occasions where Jackie delayed or denied Jake medical attention. This would not be a major issue if Jake were an ordinary adult, but Jake's genetic disorder required special care, and the record supports a finding that Jackie was not always vigilant in providing that care.

We also find no error in the circuit court's consideration of Jackie's ambivalence toward Jake's relationship with Anna. Generally, a court has no business

dictating the relationship that an adult has with his parents or stepparents, but again, Jake is no ordinary adult. When it comes to familial relationships, Jake has the mental age of a child. While not required to do so as a matter of law, the circuit court acted within its discretion when it considered Jackie's failure to actively facilitate a relationship between Jake and his mother. Given Jackie's lack of effort in fostering a relationship between Anna and Jake, combined with the dereliction in seeing to Jake's medical needs, we hold that the circuit court did not err in substituting Anna as Jake's guardian.

Affirmed.

VAUGHT, C.J., and HART, J., agree.